## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 07 2016, 8:41 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: K.B., Minor Child,

and

L.B., Father,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

July 7, 2016

Court of Appeals Case No. 54A05-1601-JT-55

Appeal from the Montgomery Circuit Court

The Honorable Harry A. Siamas, Judge

Trial Court Cause No. 54C01-1508-JT-189

**Brown, Judge.**

[1] L.B. ("Father") appeals the involuntary termination of his parental rights with respect to his son K.B. Father raises one issue which we revise and restate as whether the evidence is sufficient to support the termination of his parental rights. We affirm.

## Facts and Procedural History

[2] In 2012, Father was arrested on federal charges of armed robbery and possession of a firearm in Washington D.C. He was incarcerated for a period of time and placed on probation. That same year, a warrant was issued for his failure to appear in Florida, and he was incarcerated at some point. In 2013, a charge of neglect of a child with great bodily harm related to Father's younger brother was filed against Father, but the charge was later dismissed.

[3] On December 27, 2013, K.B. was born to Father and S. ("Mother").[1] K.B. tested positive for THC when he was born. On June 5, 2014, Father committed disorderly conduct and illegal consumption of alcohol and was arrested, and five or six days later he was released on his own recognizance. A relative cared for K.B. for a period of time, but eventually informed DCS that he could no longer care for the child, and DCS placed K.B. in protective custody.

---

[1] Mother signed a consent to adoption on June 1, 2015.

[4] While Father was released, DCS recommended services. Father failed to show up for multiple visitations with K.B and tested positive for marijuana. In July 2014, he told DCS that he was "trying to get a job and so he wanted to suspend his visitation for a week." *Id.* at 42. During another period of time, Father and Mother went to Cincinnati "to try to work" and visitation was suspended again. *Id.* Father did not complete his substance abuse evaluation, and participated in "a little bit of home based case management," but "there was at least one cancellation" by him. *Id.* at 43.

[5] On June 23, 2014, the Department of Child Services filed a petition alleging that K.B. was a child in need of services ("CHINS").[2] On August 18, 2014, the court held a hearing and found that K.B. was a CHINS because Father and Mother were homeless.

[6] On September 17, 2014, the court held a dispositional hearing, and on September 21, 2014, Father's federal probation was revoked based upon his commission of disorderly conduct and underage drinking. On September 22, 2014, the court entered a dispositional order requiring Father to "participate in individual therapy and a substance abuse evaluation and follow all recommendations, home-based case management, have a medication evaluation and participate in medication management appointments and provide drug screens when requested by DCS and service providers." DCS

---

[2] The record does not contain a copy of the petition.

Exhibit 4 at 1. The court also ordered Father to cooperate with DCS and all service providers and have supervised visits two times per week as arranged through DCS.

[7] At some point, Father sent a letter to DCS with his mother's phone number indicating that he wanted DCS to contact her and determine if she would be a possible placement for K.B. He also asked: "Is there anything I can do to work on my progress?" Transcript at 39. The phone number was not a working number, and DCS was unable to contact Father's mother.

[8] In August 2015, DCS filed a verified petition for the involuntary termination of the parent-child relationship between Father and K.B.[3] On September 24, 2015, the court held an initial hearing at which Father appeared telephonically and stated that his earliest release date was February 18, 2017.

[9] On December 17, 2015, the court held an evidentiary hearing. Father attended "by telephonic conference from his place of incarceration in a federal penitentiary," and his attorney was present in the courtroom. *Id.* at 17. Family Case Manager Daniel Maxie ("FCM Maxie"), Family Case Manager Samantha Blackford, ("FCM Blackford"), and Court Appointed Special Advocate Terri Griffin ("CASA Griffin"), testified. FCM Maxie testified that he tried to ask Father if there was some way that he could complete some

---

[3] The record does not contain a copy of the petition.

services while he was incarcerated but he did not receive a response from Father.

[10] K.B.'s great aunt testified that she and her husband had K.B. for thirteen months and that she planned to adopt him if Father's parental rights were terminated. She also testified that she had never met Father.

[11] Father testified that he was born in 1994, he was in a federal penitentiary, and he had been there for "a little over nine, ten months," and that he had not seen K.B. since August 2014. *Id.* at 19. He also testified that he has a three-year-old child, L.L.B., who lives with her grandfather. Father moved to Indiana in December 2013 because the mother of his oldest child informed him that he would have a stable home and environment to raise L.L.B., but that did not happen and he was homeless by June 2014. When asked whether there were any offerings in the federal facility, Father stated: "At this time I have currently participated in parenting classes. I'm currently participating in obtaining my GED and I'm not able to do the residential drug program here because I don't have enough time left on my incarceration." *Id.* at 56. He testified that he tested positive for marijuana but that was "at the very beginning when [K.B.] was very first born," that he had negative drug screens after that, and that his earliest possible release date was February 2017. *Id.* at 57. He stated that he was "currently signed up and on the list to get in the HVAC program so [he would] be certified HVAC before [his] release," that he has a contact in Florida who has friends who have an HVAC company, and that he planned to return to Florida and obtain housing and a job upon his release. *Id.* at 58.

Father further testified that he had been incarcerated in Pennsylvania, Kentucky, Colorado, Oklahoma, and Virginia since the revocation of his probation, and that he was moved around so much between different federal prisons for his protection because he cooperated on his original case by testifying against two codefendants. When asked to describe the facts of the armed robbery, Father explained that it was a gang initiation for another member of the gang, that he just happened to be in the vicinity, and that someone gave him some of the stolen property to hold for him. He also stated that he would be in a witness protection program once he is released.

On January 4, 2016, the court entered an order terminating Father's parental rights. Specifically, the order states in part:

FINDINGS OF FACT

* * * * *

2. Early in June both of [K.B.'s] parents had been arrested for illegal consumption of alcohol and [Father] was arrested for disorderly conduct as well. When [Father] was released from jail he was homeless. On June 18, 2014 [Mother] and her mother were arrested and the next day the relative who was caring for [K.B.] reported to the DCS that he could no longer care for the child. Since [K.B.'s] mother was in jail and [Father] was homeless the DCS took the child into protective custody on June 19, 2014. The child was never returned to the home or care of either parent.

3. The DCS attempted to offer reunification services to both parents after their release from jail in June 2014. [Father] was

offered a substance abuse evaluation, home-based case management services and supervised visitation with [K.B.]. However, [Father] did not do the substance abuse evaluation. He was inconsistent in his visits with [K.B.]. He did not show up for several of his arranged visits. [Father] tested positive for marijuana use during this time. [Father] remained homeless and he did not obtain steady employment during this period. In September 2014, [Father] and [Mother] left Indiana and went to Florida. They returned to Indiana after about a week. Within a few days federal authorities took [Father] into custody for a probation violation. [Father] has been in federal prison since September 2014.

4. . . . . Neither parent participated in the services the DCS offered. [Father] was in prison.

5. [Father] has a juvenile and a criminal history. He is twenty-one years old. In 2012 he was arrested for armed robbery and possession of a firearm in Washington DC. [Father] was participating in a gang initiation. [Father] served sixteen months in prison initially and then given forty eight months probation. This probation was revoked in 2014 and [Father] now is serving the balance of that sentence. His earliest release date from federal prison is February 2017.

6. The last time [Father] saw [K.B.] was in August 2014.

* * * * *

8. [Father] requested that [K.B.] be placed with his mother who resides in Florida. However, the DCS was never able to make contact with [Father's] mother.

9. [K.B.'s] Court Appointed Special Advocate testified that it is in [K.B.'s] best interest that parental rights be terminated and for [K.B.] to be adopted. [K.B.] has been in the home of his great aunt and uncle since November of 2014. [K.B.] is bonded with his great aunt and uncle and considers them to be his parents. His great aunt and uncle wish to adopt [K.B.]. [K.B.] is doing well in the home of his prospective adoptive parents. The DCS plan post termination is for [K.B.'s] great aunt and uncle to adopt him.

10. Since his arrest [Father] has been incarcerated in federal prisons in Pennsylvania, Virginia, Kentucky, Colorado and Oklahoma. While incarcerated he has participated in parenting classes and he is working on his GED. [Father] wants the DCS to place [K.B.] with his mother in Florida while he is incarcerated. He claims that he will be placed in the witness protection program upon his release and he would like to reunify with [K.B.].

CONCLUSIONS OF LAW

20. The DCS has proven by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in [K.B.'s] removal or the reasons for placement outside the home of the parents will not be remedied. . . . [Father] will continue to be incarcerated in a federal prison until February 2017. He has not seen [K.B.] since August 2014 when [K.B.] was eight months old. [Father] did not take advantage of services the DCS offered for the short time that he was out of jail in the summer of 2014. During that time he was homeless, used marijuana, failed to find steady employment and was inconsistent in visiting with [K.B.]. [Father] has a history of juvenile delinquency and criminality dating back to 2010.

21. The DCS has proven by clear and convincing evidence that termination of parental rights is in the best interest of [K.B.]. [K.B.] does not know [Father]. [K.B.] is bonded with his pre-adoptive parents and they are the only parents that he recognizes now. [K.B.] is doing well in their home. It is not in [K.B.'s] best interest to wait more than a year to see if [Father] can participate consistently in services in order to attempt reunification at some distant point in the future.

22. The DCS has proven by clear and convincing evidence that it has a satisfactory plan for [K.B.] post-termination: adoption.

23. The Court finds that it is in the best interest of [K.B.] that parental rights are terminated and the child should be made available for adoption by his placement parents.

Appellant's Appendix at 4-8.

## *Discussion*

[14] The issue is whether the evidence is sufficient to support the termination of Father's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

[15] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.,* 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied.* This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* "We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *Id.* (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592

N.E.2d 1232, 1235 (Ind. 1992)). "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id.*

[16] "Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence." *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires *the reviewing court itself* to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

[17] Father argues that DCS did not establish that the reasons for removal will not be remedied and that: there was no indication he had any relationship with Mother; there was no indication any effort was made to take K.B. to see Father when he was in the Montgomery County jail even though Father indicated great interest in his son; the services offered were limited in the short time

between removal and his incarceration; he held a job for portions of time and had received training for work in HVAC; he had only one positive test for THC at the very beginning of the case; and he was twenty-one years old at the time of the hearing and has a very limited criminal history.

[18] DCS argues that Father does not specifically challenge any of the trial court's findings of fact and that the unchallenged findings support the court's judgment. DCS also contends that it cannot be said that the court's decision is clearly erroneous in light of the trial court's opportunity to judge the credibility of the witnesses firsthand, Father's failure to participate in services, his failure to consistently attend visits, and his criminal history and current incarceration.

[19] Father challenges only the court's conclusion that there is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside Father's home will not be remedied. In determining whether the conditions that resulted in the child's removal will not be remedied, we engage in a two-step analysis. *E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts

made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *Id.* "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (citation and internal quotation marks omitted).

[20] As pointed out by the trial court, Father has a juvenile and criminal history. As a juvenile, charges were brought against him for obstruction of justice and disorderly conduct in 2010. In 2012, he was arrested for armed robbery and possession of a firearm in Washington D.C. related to a gang initiation. After K.B.'s birth in December 2013, he was arrested for illegal consumption of alcohol and disorderly conduct.

[21] Between the date of DCS's involvement and Father's current incarceration began, Father failed to utilize or was inconsistent with the services offered by DCS. FCM Maxie testified that, during the time Father was not incarcerated between June 10 or 11, 2014, and September 2014, Father failed to show up for a couple of visitations, he told DCS in July that he was trying to obtain a job and wanted to suspend his visitation for a week, and during another period Father went to Cincinnati to try to work and visitation was suspended again. He also testified that Father did not complete his substance abuse evaluation. FCM Maxie testified that "as far as therapy it was recommended and I don't, if

[Father] did it I think it might have been maybe one session, maybe two, but I don't think that was the case either." Transcript at 42. He also stated that "there was a little bit of home based case management," but "there was at least one cancellation I think by both [Father] and [Mother] with the home based case manager as well." *Id.* at 43.

[22] At the time of K.B.'s removal, Father was homeless. Father also tested positive for marijuana after DCS became involved. The last time he saw K.B. was in August 2014. When the court entered its order terminating Father's parental rights on January 4, 2016, Father's earliest release date was more than a year away.

[23] FCM Blackford testified that DCS thought that there was a reasonable probability that the conditions that resulted in K.B.'s removal or placement outside his home would not be remedied because Father was incarcerated in a federal facility and would not be released until 2017. She also testified that it was in K.B.'s best interest that Father's parental rights be terminated. CASA Griffin testified that that she believed it was in the child's best interests to terminate Father's parental rights.

[24] Based upon the court's findings and the record, we cannot say that it was clearly erroneous for the trial court to conclude that there was a reasonable probability that the conditions leading to K.B.'s removal would not be remedied. *See In re E.M.*, 4 N.E.3d at 649 (stating that "[b]ecause the trial court could reasonably have reached either conclusion, our deferential standard of

review is dispositive," and holding that it was not clearly erroneous for the trial court to conclude the father's efforts simply came too late).

## *Conclusion*

[25] We conclude that the trial court's judgment terminating the parental rights of Father is supported by clear and convincing evidence. We find no error and affirm.

[26] Affirmed.

Baker, J., and May, J., concur.